**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

DAWN BURNS, as Administratrix of the Estate of Robert
Burns, Jr.,

                                     Plaintiff,

v.

RENSSELAER COUNTY; NEW YORK CORRECT
CARE SOLUTIONS MEDICAL SERVICES, P.C.;
CORRECT CARE SOLUTIONS, LLC; CORRECT CARE
SOLUTIONS GROUP HOLDINGS, LLC; RUSSELL
FRICKE; SAMARITAN HOSPITAL OF TROY, NEW
YORK; ST. PETER'S HOSPITAL OF THE CITY OF
ALBANY; ST. PETER'S HEALTH PARTNERS;
ALBANY CARDIOTHORACIC SURGEONS; U.S.
ACUTE CARE SOLUTIONS; A. SANCHEZ; DEBORAH
DEMAURIO; RACHAEL THOMAS; MAMIE CATON;
DOUGLAS WALLED; and NILOO EDWARDS,

                                  Defendants.

9:19-cv-00701 (BKS/CFH)

_____

**Appearances:**

_For Plaintiff:_
Elmer Robert Keach, III
Law Offices of Elmer Robert Keach, III, PC
One Pine West Plaza, Suite 109
Albany, NY 12205

_For Defendant Russell Fricke:_
Emily A. Phillips
Maynard, O'Connor, Smith & Catalinotto, LLP
6 Tower Place
Albany, NY 12203

_For Defendants Rensselaer County, New York Correct Care Solutions Medical Services, P.C.,_
_Correct Care Solutions, LLC, Correct Care Solutions Group Holdings, LLC, A. Sanchez,_
_Deborah DeMaurio, and Rachael Thomas:_
Paul A. Sanders
Steven E. Mach
Barclay Damon LLP
100 Chestnut Street, Suite 2000

Rochester, NY 14604

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Dawn Burns, on behalf of the estate of Robert Burns, Jr., brings this wrongful death action alleging violations of the Eighth and Fourteenth Amendments and New York law following Robert Burns, Jr.'s death while he was being held as a pretrial detainee at the Rensselaer County Jail ("RCJ").[1] (Dkt. No. 115). Presently before the Court are two motions to dismiss the Third Amended Complaint ("TAC") under Federal Rule of Civil Procedure 12(b)(6), one filed by Defendant Russell Fricke, (Dkt. No. 144), and a separate one filed by Defendants Rensselaer County, New York Correct Care Solutions Medical Services, P.C., Correct Care Solutions, LLC, Correct Care Solutions Group Holdings, LLC, A. Sanchez, Deborah DeMaurio, and Rachael Thomas, (Dkt. No. 145). For the reasons that follow, Defendants' motions are granted in part and denied in part.

---

[1] There are few facts concerning Burns' arrest and detention; he may have been arrested on a parole warrant. (Dkt. No. 153-2, ¶ 5). The parties have not addressed this and assume Burns' status is that of a pretrial detainee, requiring application of the Fourteenth Amendment, rather than the Eighth Amendment which applies to convicted prisoners. *See Darnell v. Pineiro*, 849 F.3d 17, 29 & 33 n.9 (2d Cir. 2017) (explaining that a pretrial detainee's claim for "deliberate indifference to [a] serious threat to health or safety," is "governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment"). The Court follows suit, but notes that the "issue of whether a person confined during the pendency of probation violation proceedings should be treated as a pretrial detainee or a convicted prisoner for purposes of a constitutional challenge to jail conditions is an issue upon which courts have differed." *Rosenblum v. Blackstone*, No. 18-cv-966, 2020 WL 1049916, at *10, 2020 U.S. Dist. LEXIS 40403, at *30–31 (C.D. Cal. Jan. 22, 2020) (citing cases). The Court further notes that the serious allegations of deliberate indifference to medical care at issue in this case are sufficient to state claims under both the Eighth and Fourteenth Amendments.

## II.    FACTS[2]

### A.    Correct Care Defendants and Rensselaer County

Defendant Correct Care Solutions, Inc.,[3] and its principal company, Correct Care Solutions Group Holdings, LLC (collectively "Correct Care"), "are one of the largest providers of privatized medical care in prisons and local correctional facilities across the country." (Dkt. No. 115, ¶ 45). At some point prior to March 2018, Rensselaer County entered a "capitation contract" to employ "Correct Care" "as the Medical Provider" at the RCJ. (Dkt. No. 115, ¶¶ 66, 70). Defendant Russell Fricke is employed by "Correct Care Solutions" as a physician and medical director at the RCJ and "is responsible for establishing policies and procedures in the medical department." (*Id.* ¶ 10). Defendant A. Sanchez was employed by "Correct Care Solutions" as a Family Nurse Practitioner at the RCJ. (*Id.* ¶ 16). Defendants Deborah DeMaurio

---

[2] The facts are drawn from the Third Amended Complaint, Burns' medical records, (Dkt. No. 145-2), and the Final Report of the Commission of Correction, (Dkt. No. 153-2, at 1). Defendants submitted the medical records as part of their motion to dismiss and Plaintiff submitted the Final Report in support of her response to Defendants' motion. "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is deemed "'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (quoting *DiFolco*, 622 F.3d at 111). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* (quoting *Faulkner*, 463 F.3d at 134). Plaintiff quotes and relies on both the medical records and Final Report in the TAC, (*see, e.g.*, Dkt. No. 115, ¶¶ 40, 44), and there is no dispute concerning the authenticity and accuracy of the documents. Indeed, it is uncontested that these documents are integral to the TAC, and the Court has therefore considered these documents. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

[3] The TAC names as Defendants, "New York Correct Care Solutions Medical Services, P.C.," "Correct Care Solutions, LLC," and "Correct Care Solutions Group Holdings, LLC," (Dkt. No. 115, at 1), but not Correct Care Solutions, *Inc.*," despite referring to this entity in the body of the TAC. (*See id.* ¶ 45). The Court notes that there are no factual allegations in the TAC about the named entities or which was the party to the contract with Rensselaer County or the employer of Defendants Fricke, DeMaurio, Thomas, and Sanchez. For ease of reference, the Court refers to them collectively as "Correct Care" or "Correct Care Solutions." The parties will be expected to identify the proper Correct Care Defendant(s) in discovery and make any amendments necessary.

and Rachael Thomas are employed by "Correct Care Solutions" as Registered Nurses at the RCJ. (*Id.* ¶¶ 17–18).

### B.     Robert Burns

On March 7, 2018, less than one week after leaving Samaritan Hospital where he was being treated for chest pain, Robert Burns was arrested and brought to the RCJ, where he was detained. He died in custody on March 14, 2018, at age 38, of "Type A aortic dissection with Acute Myocardial Infarction." (Dkt. No. 153-2, at 2). The following are the facts alleged concerning his hospitalization, detention, and death.

### 1.     March 1, 2018 to March 2, 2018—First Admission to Hospital

On March 1, 2018—six days before his arrest and detention—Burns was admitted to the Samaritan Hospital of Troy "for complaints of chest pain." (Dkt. No. 115, ¶ 24). Imaging revealed "a 4.2 cm aortic aneurysm and a questionable mural thrombus his ascending aorta." (*Id.*). Burns was transferred to St. Peter's Hospital of the City of Albany "for a gated CT which is a scan used to detect heart function." (*Id.*). Dr. Douglas Walled and Dr. Niloo Edwards, who was a cardiothoracic surgeon, "extensively discussed" the radiologic findings, which appeared to reveal "no evidence of aortic dissection but" showed "a probable congenital anomaly on the left coronary sinus." (*Id.* ¶ 25). The radiologic findings "were reported" to Burns, who, on March 2, 2018, "ultimately decided to discharge himself from the hospital against medical advice." (*Id.* ¶ 26; Dkt. No. 153-2, at 2).

This interpretation of the radiologic findings, however, was wrong: Plaintiff actually had an aortic dissection, which is "an emergent medical condition in which the inner layer of the aorta tears which results in blood" surging through the tear, separating or dissecting the inner and middle layers of the aorta. (Dkt. No. 115, ¶ 25). The error appears not to have been discovered until after Burns' death on March 14, 2018.

### 2.   March 7, 2018—Arrest, Detention and Second Hospital Visit

On March 7, 2018, Burns "was arrested and admitted" to the RCJ. (*Id.* ¶ 27). Upon

admission, Burns reported to Defendant Nurse Rachael Thomas that he had been hospitalized

recently for "hypertension and a myocardial infarction," and that he had "been taking several

hypertension medications but had not taken them for the past three days." (*Id.*). Burns also

"reported that he had had chest pain since leaving the hospital on March 1." (*Id.*). Nurse Thomas

performed an EKG "which showed a sinus rhythm with an anteroseptal infarct."[4] (*Id.*; Dkt. No.

145-2, at 11). Nurse Thomas reported the EKG results to Defendant FNP Sanchez. (Dkt. No.

115, ¶ 27). FNP Sanchez assessed Burns, who was "dry heaving, had increased chest pain, and

cold shivers, and alarmingly high blood pressure that could not be reduced by administration of

Nitroglycerine and Tylenol." (*Id.*). According to the TAC, Burns "was observed stating that he

'was scared.'" (*Id.*). "Burns was transported to Samaritan Hospital." (*Id.*).

At Samaritan Hospital, Defendant Dr. Mamie Caton performed "several EKGs that

indicated a sinus rhythm septal infarct, but with no acute ischemic infarct." (*Id.* ¶ 29). Dr. Caton

found Burns had "an extremely elevated blood pressure" "on several occasions." (*Id.*). Burns told

Dr. Caton that "he had a prior hospitalization," but she "failed to review Mr. Burns' prior records

from St. Peter's Hospital." (*Id.*). That evening, Burns "was returned to the [RCJ] where he was

observed to still have elevated blood pressure." (*Id.* ¶ 32). Neither Samaritan Hospital nor Dr.

Caton sent "appropriate discharge paperwork" with Burns back to the RCJ and the RCJ's

medical staff "failed . . . to affirmatively obtain Mr. Burns' discharge paperwork."[5] (*Id.*).

---

[4] According to the TAC, the EKG results were "substantially worse than the EKG performed on [Burns] at St. Peter's," but there are no allegations that would allow an inference that Nurse Thomas, or anyone at RCJ, had access to Burns' EKG report from St. Peter's. (Dkt. No. 115, ¶ 27).

[5] The "discharge paperwork was not sent to the jail until after Mr. Burns' death." (*Id.* ¶ 30).

According to the TAC, "staff at Samaritan Hospital reported having a conversation with Defendant [Nurse] Deborah DeMaurio" at the RCJ. (*Id.*). There was, however, no "corresponding note in Mr. Burns' medical records at the jail" documenting this conversation. (*Id.*). That evening, Nurse DeMaurio called the RCJ physician, Defendant Dr. Russell Fricke, "and he ordered blood pressure medication."[6] (*Id.* ¶ 33).

### 3. Thursday, March 8, 2018 to Sunday, March 11, 2018

The next day, March 8, 2018, FNP Sanchez saw Burns "for his initial visit and for an ER-follow-up." (*Id.* ¶ 34). Burns reported "dull" chest pain. (Dkt. No. 145-2, at 17). NP Sanchez noted that Burns had high blood pressure but did not "follow up with Samaritan Hospital to obtain appropriate discharge paperwork and lab results."[7] (Dkt. No. 115, ¶ 34). Under "Interventions and Plan," FNP Sanchez checked "diet/nutrition," "medication," "disease process," and "exercise." (Dkt. No. 145-2, at 16). Burns was "not regularly given his blood pressure medications," and on "at least one occasion . . . nurses failed to give him more than one medication." (Dkt. No. 115, ¶ 35).

Burns continued to experience "dizziness, lightheadedness, chest pain, and a general feeling of being unwell." (*Id.* ¶ 36). Burns told his wife (Dawn Burns, the Plaintiff in this case), "that he had complained to medical staff on several occasions about his symptoms, but was told there was nothing wrong with him, and he should go back to his cell." (*Id.*).

---

[6] According to the medical records, Dr. Fricke ordered Lisinopril, Nifedipine, and Labetolol. (Dkt. No. 145-2, at 2, 18).

[7] NP Sanchez's notes indicate that Burns' "ER visit" was "unremarkable" and that she "reviewed "ER visit notes/D/C summary" with Burns. (*Id.* at 17). According to the Commission report, "the hospital discharge paperwork" that NP Sanchez "reviewed with Burns was the regular discharge form that is given to patients during the discharge process from the hospital; it contained information about when to return to the ER if symptoms persist." (Dkt. No. 153-2, at 5).

### 4.      Monday, March 12, 2018

On March 12, 2018, Burns saw Nurse DeMaurio "for complaints of chest pain." (*Id.* ¶ 37). The report from an EKG performed that day indicated "septal infarct, slight inferior repolarization disturbance, consider ischemia" and "[a]bnormal ECG." (Dkt. No. 145-2, at 10). The record also contains a Correct Care "Nursing Documentation Pathway" form for "Chest Pain" that Nurse DeMaurio used when evaluating Burns. (*Id.* at 28–30). On the form, Nurse DeMaurio noted that Burns' complaint of chest pain was "New Onset" and, under "Medical History," checked "Hypertension" but did not check "Hospitalizations" or "Past MI." (*Id.* at 28). This was despite the fact that Burns had reported his March 1 hospitalization for myocardial infarction to Nurse Thomas and had been sent to Samaritan Hospital for evaluation for chest pain on March 7. (*Id.*). Nurse DeMaurio "claims to have notified Dr. Fricke of her evaluation," and Dr. Fricke "ordered Tylenol for Mr. Burns." (Dkt. No. 115, ¶ 37).

### 5.      Tuesday, March 13, 2018

On March 13, 2018, the day before his death, "Burns reported to Defendant Sanchez that his 'heart [was] bothering [him] again last night.'" (*Id.* ¶ 39). "Despite confirming that Mr. Burns had an abnormal EKG and elevated blood pressure," FNP Sanchez "instructed [Burns] to stretch and relax." (*Id.*).

### 6.      Wednesday, March 14, 2018

On March 14, 2018, at 9:00 a.m., Burns went to the medical unit and told FNP Sanchez that he had "chest pain that had lasted through the night." (*Id.* ¶ 40). FNP Sanchez "evaluated him and observed that he still had elevated blood pressure, that he was upset and teary," and that he was "pleading for help, stating that he did not want to 'die in jail.'" (*Id.*). FNP Sanchez performed an EKG, "which produced abnormal results." (*Id.*; Dkt. No. 145-2, at 8 (EKG report indicating "anteroseptal infarct, moderate inferior repolarization disturbance, consider ischemia,

and '[a]bnormal ECG")). According to her notes, FNP Sanchez reassured Burns that "he will be

taken care of" and that they "will help him." (Dkt. No. 115, ¶ 40). FNP Sanchez ordered "four 81

mg Aspirins and Benadryl 50 mg" and ordered "stat labs." (Dkt. No. 153-2, at 5).

At 9:45 a.m., NP Sanchez received and reviewed Burns' March 1, 2018 discharge

summary from St. Peter's Hospital, including the "gated CT Scan." (Dkt. No. 153-2, at 5–6; Dkt.

No. 115, ¶ 42).

At 5:00 p.m., Burns "was found unresponsive in his cell." (*Id.* ¶ 43). Burns "had suffered

a fatal loss of oxygen resulting in his death." (*Id.*). Burns' records reflect that he died from

"aortic dissection." (*Id.*).

### C.    Commission of Correction Report

In a December 17, 2019 "Final Report" "In the Matter of the Death or Robert Burns," the

Medical Review Board of the New York State Commission of Correction (the "Medical Review

Board" or "Commission") found that Burns died of "a Type A aortic dissection with Acute

Myocardial Infarction" while in the custody of the RCJ and that:

> there were serious departures from accepted standards of medical
> care including: failure to obtain and review complete hospital
> discharge records, absent physician oversight and review, failure by
> the nurse practitioner to recognize signs of acute coronary
> syndrome, and failure to refer a high-risk management patient to the
> jail physician. These system-wide failures as well as failures by the
> individual health-care providers directly contributed to Burns' death
> despite having well-recognized symptoms and clearly documented
> history.

(Dkt. No. 153-2, at 2). The Medical Review Board also made a number of findings regarding the

medical care Nurse Thomas, Nurse DeMaurio, FNP Sanchez, and Dr. Fricke provided. (*Id.*).

Specifically, it found that: (1) Nurse Thomas "did not properly communicate the information

received during Burns' admission [on March 7, 2018] regarding his cardiac history and previous

hospital admission with an [against medical advice] discharge" to FNP Sanchez, (*id.* at 3); (2)

when Burns was discharged from Samaritan Hospital to the RCJ on March 7, Nurse DeMaurio did not document in Burns' RCJ medical records that she had received a "nurse report from Samaritan Hospital or report any findings from the hospital testing," (*id.* at 4); (3) when Burns was seen by Nurse DeMaurio on March 12 for complaints of chest pain, and Dr. Fricke "was notified and ordered a one-time does of Tylenol," Nurse DeMaurio inadequately documented "what Dr. F[ricke] was told regarding the assessment and the reason for the Tylenol order," (*id.* at 5); (4) when Burns was seen by FNP Sanchez on March 13 "for complaints of his heart bothering him the night prior" after "doing 10 pull-ups," and FNP Sanchez found that he had high blood pressure and an abnormal EKG, she recommended stretching exercises, "failed to recognize Burns' obvious signs and symptoms of acute coronary syndrome, having unresolved chest complaints since 3-7-19, and failed [to] complete a thorough record review of Burns' recent hospitalizations," and there was "no referral made nor any review completed by the jail physician despite Burns being a patient with complex cardiac and hypertension issues," (*id.* at 5); (5) when Burns returned to see FNP Sanchez at 9:00 a.m., on March 14 with complaints of chest pain, FNP Sanchez "failed to properly interpret substantial findings on the EKG including ST and T wave abnormalities with septal infarct in addition to the elevation in V3 and ST depressions in V5–V6," and failed to "immediately refer[]" Burns "to a hospital for an evaluation," instead ordering "stat labs, including a troponin level," which "serves no value to patient care as any actionable results must be managed at a hospital," (*id.*); and (6) at 9:45 a.m. on March 14, when FNP Sanchez received and reviewed Burns' discharge summary from his March 1 St. Peter's Hospital admission, "being aware of Burns' symptoms at the time," she "should have immediately transferred Burns to the hospital for evaluation," where he could have

"receive[d] percutaneous coronary intervention," which could have prevented his death, (*id.* at 5–6).

The Medical Review Board directed the "Jail Physician" to take the following actions: (1) conduct a quality assurance review with Nurse DeMaurio "about the absence of any documentation on her part, regarding Burns' discharge summary, and the recommendations and follow-up care paperwork from Samaritan Hospital"; (2) "conduct a quality assurance review with" Nurse Thomas "as to why Burns' cardiac history was not relayed verbally to [FNP Sanchez] while Burns was being evaluated for chest pain on 3/7/18"; (3) "conduct a quality assurance review" with FNP Sanchez regarding why "Burns was not immediately transferred to the hospital for an evaluation," "[w]hy significant changes to Burns' EKG where [sic] not identified and provided timely intervention for," and "[w]hy Burns' case, a patient with complex cardiac conditions and hypertension, was not referred to the Jail Physician for review and consultation"; and (4) "conduct a review into the policy of receiving medical records and recording the receipt of the records to assure the continuity of care of hospitalized inmates." (*Id.* at 6–7).

## III.    STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court

must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.   DISCUSSION

### A.   Deliberate Indifference to Serious Medical Need

#### 1.   Dr. Fricke, Nurse Thomas, and Nurse DeMaurio

Dr. Fricke, Nurse Thomas, and Nurse DeMaurio move to dismiss Plaintiff's Fourteenth Amendment deliberate indifference to serious medical need and supervisory liability claims. (Dkt. No. 144-3, at 13–23; Dkt. No. 145-3, at 21–25). In response, Plaintiff acknowledges that she fails to adequately allege this claim against Dr. Fricke, Nurse Thomas, or Nurse DeMaurio and agrees to the discontinuance of her federal claims against Dr. Fricke and Nurse Thomas without prejudice should discovery provide evidence of "broader involvement by these individuals." (Dkt. No. 153, at 6). Plaintiff agrees to the discontinuance of her claims against Nurse DeMaurio "with prejudice, based on the admission by Correct Care Solutions that the company is vicariously liable for any actions or inactions on her behalf." (Dkt. No. 153, at 6). Accordingly, Plaintiff's § 1983 claims against Defendants Fricke,[8] Thomas, and DeMaurio are dismissed.

---

[8] The Court notes that as part of his motion to dismiss, Dr. Fricke moved to strike paragraph 76 of the TAC, which refers to a "PHS" report that evaluated "another company for whom Dr. Fricke worked." (Dkt. No. 144-3, at 24 (citing Dkt. No. 115, ¶ 76)). It also contains allegations regarding Dr. Fricke's purported awareness "of the significant problems with which the healthcare system at the jail operated," but failure to take "corrective action in the way he operated, nor provided instruction to his subordinate nursing staff," and awareness of Burns' "serious emergent cardiac condition" but failure to "do his own assessment." (Dkt. No. 115, ¶ 115). Dr. Fricke argues that these allegations are "irrelevant, not supported by facts, futile and intended solely as adornments." (Dkt. No. 144-3, at 24). Dr. Fricke also takes issue with paragraph 73 of the TAC, which contains allegations regarding the Commission's direction to Dr. Fricke to conduct various reviews following the deaths of two inmates at Schenectady County Jail. (Dkt. No. 114-3,

### 2.   FNP Sanchez

FNP Sanchez seeks dismissal of Plaintiff's deliberate indifference to serious medical needs claim on the ground that the TAC fails to plead intentional or reckless conduct. A pretrial detainee's  claim for "deliberate indifference to [a] serious threat to health or safety," such as the failure to treat a serious medical need, *Darnell v. Pineiro*, 849 F.3d 17, 33 n.9 (2d Cir. 2017), is "governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment." *Id.* at 29. The distinction arises because pre-trial detainees "have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007) (internal quotation marks omitted).

A pretrial detainee alleging deliberate indifference to serious medical needs under the Fourteenth Amendment must establish: (1) that the detainee had a serious medical need; and (2) that the defendant either: "acted intentionally to impose the alleged condition" or "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or *should have known*, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 30, 35 (emphasis added); *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019); *see also Walker v. Wright*, No. 17-cv-425, 2018 WL 2225009, at *5, 2018 U.S. Dist. LEXIS 81408, at *12 (D. Conn. May 15, 2018) (noting that, while *Darnell's* holding was applied to a conditions of confinement claim, "[d]istrict courts in this Circuit have . . . applied *Darnell's* objective 'mens rea' prong to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment"). "In other

---

at 24 (citing Dkt. No. 115, ¶ 73)). The Court declines to strike these paragraphs from the TAC at this stage of the litigation.

words, the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim [under the

Fourteenth Amendment] is defined objectively." *Darnell*, 849 F.3d at 35.

FNP Sanchez does not appear to dispute that the TAC adequately alleges that Burns was

suffering from a serious medical condition. The TAC alleges that while at the RCJ, Burns had

continuing, unresolved chest pain, "alarmingly high blood pressure," and "cold shivers"; was

"dry heaving," "teary," and "scared"; and told FNP Sanchez that he did not want to die in jail.

(Dkt. No. 115, ¶ 27). *See Melvin v. Cnty. of Westchester*, No. 14-cv-2995, 2016 WL 1254394, at

\*5, 2016 U.S. Dist. LEXIS 41120, at \*15–16 (S.D.N.Y. Mar. 29, 2016) (finding "sufficiently

serious" medical condition where the complaint alleged that the plaintiff "suffered not only chest

pains, but also abnormally high blood pressure and a very low pulse rate . . . along with the

allegations of substantial pain") (internal quotation marks omitted). Accordingly, the Court must

consider whether the TAC plausibly alleges that FNP Sanchez acted with deliberate indifference.

"[A] detainee asserting a Fourteenth Amendment claim for deliberate indifference" must

allege "either that [1] the defendants *knew* that failing to provide the complained of medical

treatment would pose a substantial risk to his health or [2] that the defendants *should have known*

that failing to provide the omitted medical treatment would pose a substantial risk to the

detainee's health." *Charles*, 925 F.3d at 87. Defendants correctly note that upon admission to the

RCJ, FNP Sanchez sent Burns for emergency medical care at Samaritan Hospital. But even if

this medical care was adequate, it does not prohibit an inference that she was deliberately

indifferent to Burns in the care she provided in the days after he returned from the hospital.

Regarding this time period—March 8 to 14, 2018—the TAC alleges that in response to

Plaintiff's continuous and unresolved complaints of chest pain, consistently high blood pressure,

three "abnormal" EKGs, and teary pleas for help because he did not want to die in jail, FNP

Sanchez made no effort to obtain the reports from Plaintiff's March 7 hospital visit, and instead prescribed stretching, relaxation, aspirin, and Benadryl. (Dkt. No. 115, ¶¶ 39–40; Dkt. No. 153-2, at 5). Even after receiving and reviewing the "gated CT report" discussing Burns' heart abnormalities just forty-five minutes after speaking with Burns and hearing his pleas for help, FNP Sanchez took no action.

From these allegations it is plausible to infer that NP Sanchez "failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [she] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see Smith v. Outlaw*, No. 15-cv-9961, 2017 WL 4417699, at *4, 2017 U.S. Dist. LEXIS 163693, at *11–12 (S.D.N.Y. Sept. 30, 2017) (concluding that, where the plaintiff alleged he was on medication for a pre-existing heart condition and complained of chest pains numbness and stiffness in his left arm but received no treatment and suffered a heart attack, the plaintiff "has satisfied the second aspect of the objective inquiry by demonstrating circumstances that 'pose[d] an unreasonable risk of serious damage to his health.'" (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013))). Moreover, given that FNP Sanchez was aware of Burns' repeatedly abnormal EKG results, gated CT scan, high blood pressure, and unresolved complaints of chest pain but took no further treatment steps, it is plausible to infer that FNP Sanchez's chosen treatment steps—prescribing stretching, relaxation, Tylenol and Benadryl— were "so woefully inadequate as to amount to no treatment at all." *Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("Although federal courts are 'reluctant to second guess medical judgments and constitutionalize [medical malpractice claims]' where the prisoner has actually received medical treatment, deliberate indifference will be found where 'the medical attention rendered [was] so woefully inadequate as to amount to no treatment at all.'"

(quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976))). Accordingly, the motion to dismiss the deliberate indifference claim against FNP Sanchez is denied.

### 3.    Correct Care and Rensselaer County

The Correct Care Defendants and Rensselaer County move to dismiss Plaintiff's *Monell*[9] claims. (Dkt. No. 145-3, at 14–20). "It is well established that 'under § 1983, local governments are responsible only for 'their own illegal acts.'" *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). Local governments "are not vicariously liable under § 1983 for their employees' actions." *Id.* (quoting *Connick*, 563 U.S. at 60); *see also, e.g.*, *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of respondeat superior."). "To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019).

A municipal policy or custom may be established where the facts show either: (1) a formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1985); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). To prevail on a municipal liability claim a plaintiff must show "a direct

---

[9] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

causal link between a municipal policy or custom and the alleged constitutional deprivation." *Outlaw*, 884 F.3d at 373 (quoting *City of Canton*, 489 U.S. at 385).

"[A] municipal policymaker's failure to act, generally pleaded as a failure to train/supervise claim, can trigger municipal liability where such a failure 'amounts to deliberate indifference to the rights' of those with whom municipal employees will come into contact." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d. Cir. 1992)). A plaintiff "must do more than simply state that a municipal policy or custom exists" but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Id.* (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993). "Normally, 'a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality].'" *Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (quoting *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008)).

### a.   Correct Care[10]

Plaintiff alleges that Burns' death was directly caused by Correct Care's policy, pattern, and practice of providing inadequate medical care to detainees without appropriate medical supervision by medical staff who lacked the requisite training as well as delaying or denying medical treatment to minimize cost and maximize profits. (Dkt. No. 153, at 15–16). Correct Care

---

[10] The parties do not dispute that the Complaint adequately alleges that Correct Care was serving a traditionally public function by providing medical care to detainees at the RCJ, and therefore may be sued as a state actor under § 1983. *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) ("For the purposes of section 1983, the actions of a nominally private entity are attributable to the state . . . when the entity has been delegated a public function by the state ('the public function test')." (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008))); *see also Waller v. DuBois*, No. 16-cv-6697, 2019 WL 1434576, at *5, 2019 U.S. Dist. LEXIS 54465, at *14 (S.D.N.Y. Mar. 29, 2019) (treating Correct Care "as a municipal actor for the purposes of" motion to dismiss, explaining that "when a private company provides medical care in prisons, it 'performs a role traditionally within the exclusive prerogative of the state and therefore . . . is the functional equivalent of the municipality.'" (quoting *Bess v. City of New York*, No. 11-CV-7604, 2013 WL 1164919, at *2, 2013 U.S. Dist. LEXIS 39765, at *4 (S.D.N.Y. Mar. 19, 2013))).

argues that the TAC's citation of "thirteen unrelated incidents from six different U.S. States," is insufficient to allege a "widespread practice," and that to the extent the TAC alleges a "custom or practice based on profit," this allegation "fails as a matter of law under" *Iacovangelo v. Correctional Medical Care, Inc.*, 624 F. App'x 10 (2d Cir. 2015). (Dkt. No. 156, at 5).

In *Iacovangelo*, the complaint concerned the death of a pre-trial detainee "from myocarditis, allegedly as a result of heroin withdrawal, in the Monroe County Jail." 624 F. App'x at 12. The complaint alleged that Correctional Medical Care, the medical care provider for the Monroe County Jail, "had a policy to provide inadequate medical care to prisoners, in order to save money"; listed four other incidents of allegedly inadequate medical care by CMC at county jails in New York; and cited a "hearsay newspaper article" that reported on "nine inmate deaths at jails where CMC provided medical care" and suggested "that CMC provided sub-standard care in all nine instances." *Iacovangelo v. Corr. Med. Care, Inc.*, No. 13-cv-6466, 2014 WL 4955366, at *14–15, 2014 U.S. Dist. LEXIS 140679, at *50–51 (W.D.N.Y. Oct. 2, 2014), *aff'd in part, vacated in part, remanded*, 624 F. App'x 10 (2d Cir. 2015). The district court found that the complaint failed to "plausibly allege the existence of such a policy" or "that any conduct by CMC in this action was motivated by a desire to cut costs," explaining: "it is plausible to think that it intentionally endangered inmates' health to cut costs in any instance in which an inmate received sub-standard care, even though one could offer the same speculation about any for-profit medical provider." *Iacovangelo*, 2014 WL 4955366, at *16, 2014 U.S. Dist. LEXIS 140679, at *52. The Second Circuit affirmed dismissal of the *Monell* claim, observing that "although Correctional Medical Care appears to have a troubled track record in many respects," where the complaint provided "only one additional example of a similar incident," "the plaintiff

has not pleaded a custom of not providing adequate medical supervision for inmates going through drug or alcohol withdrawal." *Iacovangelo*, 624 F. App'x at 14.

Like those in *Iacovangelo*, the allegations in the TAC concerning individuals at other facilities where Correct Care provided medical care are too dissimilar to the incident at issue to allow an inference of a widespread custom or practice. First, with one exception, there is no indication they involve detainees with heart conditions. 624 F. App'x at 14. Second, even if the Court were to cast a broader net, there is no indication that the incidents Plaintiff cites in the TAC involved failures in documentation that contributed to the injury, or failures in referring or reporting the detainee's condition to the jail physician. *See Sanchez v. New York Correct Care Sols. Med. Servs., P.C.*, No. 16-cv-6826, 2018 WL 6510759, at *10–11, 2018 U.S. Dist. LEXIS 208864, at *29–30 (W.D.N.Y. Dec. 11, 2018) (concluding that alleged incidents at other Correct Care facilities were "too speculative to state a *Monell* [inadequate medical care] claim against Monroe County" where there were "no facts indicating that the aforementioned incidents at other facilities were the result of the type of cost-cutting decisions that supposedly resulted in Sanchez's death," from a lacerated spleen, namely failure to adopt or follow policies "regarding the emergent needs of patients," failure to employ trained medical and nursing staff, and concerns regarding "the expenses involved in properly caring" for detainees).

However, contrary to Defendants' assertion, the Second Circuit has *not*, as a matter of law, rejected the proposition that a profit or cost-saving motive can serve as the basis for a *Monell* claim. *See, e.g.*, *Ceparano v. Suffolk Cnty. Dep't of Health*, 485 F. App'x 505, 508–09 (2d Cir. 2012) (finding that the plaintiff adequately alleged a municipal policy of providing inadequate medical care for the "purpose of saving money" where the plaintiff alleged that he had a spinal condition for which surgery had been scheduled prior to incarceration and that the

correctional facility's nurse practitioner, who he saw "on several occasions," refused to provide more than conservative treatment, refused to continue pain medication prescribed by prison doctor, and refused to pursue the required surgery or obtain medical records from the plaintiff's treating orthopedist). Here, however, the Court does not find the allegation that Correct Care and Rensselaer County are bound by a "capitation contract," on its own, sufficient to allow a plausible inference that the Correct Care Defendants provided inadequate medical care in an effort to save costs. There are no other allegations in the TAC regarding this contract or whether Correct Care would be responsible, for example, for the cost of sending Burns to a hospital for treatment. However, this does not end the inquiry because the Court finds the allegations in the TAC otherwise sufficient to allege a *Monell* claim against Correct Care.

Plaintiff alleges that Burns was not seen by or referred to a physician at the RCJ despite complaining of chest pain five times between March 7 and March 14 to two different nurses and a FNP and having repeatedly abnormal EKGs and high blood pressure. The Medical Review Board itself raised this concern and directed inquiry into "[w]hy Burns' case, a patient with complex cardiac conditions and hypertension, was not referred to the Jail Physician for review and consultation." (Dkt. No. 153-2, at 7). It is plausible to infer from these allegations that, in failing to notify Dr. Fricke of Burns' condition, Nurse Thomas, Nurse DeMaurio, and FNP Sanchez were acting pursuant to a policy or practice of handling even serious medical complaints on their own without consultation of a physician. *See Sanchez*, 2018 WL 6510759, at *11, 2018 U.S. Dist. LEXIS 208864, at *30 (finding the complaint pleaded *Monell* claim in case where the complaint alleged "a series of incidents involving separate actors [toward the plaintiff] over a period of at least twelve hours," explaining that it was "the consistency of these separate actors' conduct throughout this period which, in part, suggests the existence of a policy").

In addition, the TAC not only alleges that RCJ medical staff failed to timely obtain

Burns' medical records from his hospitalization at St. Peter's one week prior to entering RCJ

custody or the medical records from Samaritan Hospital following his emergency visit on March

7, 2018, but also alleges that Nurse DeMaurio failed to document the information she received

from Samaritan Hospital following Burns' visit. And given the Medical Review Board's

direction that the "Jail Physician" "conduct a review into the *policy* of receiving medical records

and recording the receipt of the records to assure the continuity of care of hospitalized inmates,"

(Dkt. No. 153-2, at 7), it is plausible to infer that their failure to do so was attributable to a

deficient RCJ or Correct Care policy concerning medical documentation that contributed to

Burns' death. *See, e.g.*, *Gleeson v. Cnty. of Nassau*, No. 15-cv-6487, 2019 WL 4754326, at *15,

2019 U.S. Dist. LEXIS 170373, at *41 (E.D.N.Y. Sept. 30, 2019) (denying summary judgment

on municipal liability claim, and finding a "triable issue of fact as to whether Armor's referral

request policy prevented Mr. Gleeson from seeing a rheumatologist, and caused his death,"

explaining that "a reasonable jury could find that Armor's woefully deficient record-keeping and

its failure to install an electronic medical records system contributed to Armor's failure to ensure

that the rheumatologist referral actually took place"). Thus, at this early stage of the case,

construing all reasonable inferences in favor of the Plaintiff, the Court concludes that the

Complaint adequately alleges municipal liability under § 1983 against Correct Care.

### b.    Rensselaer County

The Court next considers whether the TAC states a municipal liability claim against

Rensselaer County. "Contracting out prison medical care does not relieve the State of its

constitutional duty to provide adequate medical treatment to those in its custody, and it does not

deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *Carter v.

Broome Cnty.*, 394 F. Supp. 3d 228, 241–42 (N.D.N.Y. 2019) (alteration omitted) (quoting *West*

*v. Atkins*, 487 U.S. 42, 56 (1988)). Thus, Correct Care's liability does not relieve Rensselaer

County from liability and the Court must consider whether the TAC states a municipal liability

claim against Rensselaer County.

Here, Plaintiff argues that the alleged deliberate indifference to Burns' serious medical

needs, although allegedly committed by Correct Care employees, is chargeable to Rensselaer

County. Specifically, she contends that liability stems from the actions of Rensselaer County's

policymakers, Sheriff Patrick Russo and Jail Administrator David Hetman, in contracting with

Correct Care for the purpose of "saving money" despite knowing that Correct Care "will kill or

grievously harm its inmates." (Dkt. No. 115, ¶¶ 70, 87). "A decision adopted by a municipal

body is, of course, an officially promulgated policy for the purposes of *Monell* liability."

*Gleeson*, 2019 WL 4754326, at *16 n.24, 2019 U.S. Dist. LEXIS 170373, at *45 n.24

(concluding that "the County's approval and renew of its contract" with medical care provider

"constitutes an official policy" (citing *Monell*, 436 U.S. at 690)). Further, municipal liability may

attach where there are "systemic and gross deficiencies in staffing, facilities, equipment, or

procedures in a detention center's medical care system" and that "a policy-making official knows

about them and fails to correct them." *Carter*, 394 F. Supp. 3d at 242 (quoting *Dixon v. Cnty. of

Cook*, 819 F.3d 343, 348 (7th Cir. 2016)).

The TAC alleges that "as part of the bidding process to secure its contract," Correct Care

had "to disclose to the Rensselaer County Jail all prior lawsuits against it" and that there is "no

question" that Rensselaer County and its policymakers "knew about this company's troubled

history." (Dkt. No. 115, ¶ 65). The three lawsuits Plaintiff cites in the TAC were from

Pennsylvania and Illinois and there are no allegations concerning the outcomes of these actions.

(*Id.* ¶ 56). The Court therefore concludes there is no basis on which to infer these cases placed

Rensselaer County on notice of Correct Care's "troubled history." Citing Commission reports regarding deaths at the Westchester, Monroe, and Onondaga County jails from 2013 to 2015, the TAC further alleges that the Commission "has repeatedly recommended to various New York State Counties that they should consider terminating their contracts with [Correct Care] given their repeated failure to provide adequate medical care." (*Id.* ¶¶ 55–56). However, there is no allegation that Rensselaer County received these Commission reports, and thus no basis on which to infer Rensselaer County was on notice of Correct Care's alleged failures. Finally, according to the TAC, "Plaintiff's counsel knows" from the depositions of "various New York State Sheriffs" "that the topic of correctional health care, including issues surrounding various privatized medical providers is often a topic of discussion at their various annual meetings." (*Id.* ¶ 68). From this, Plaintiff "suspects" that Rensselaer County policymakers "were aware of Correct Care's troubled history." (*Id.*). These allegations are vague, speculative and contain no facts from which the Court can infer Rensselaer County policymakers knew "of Correct Care's troubled history." Therefore, they fail to state a municipal liability claim against Rensselaer County. Moreover, there are no allegations in the TAC that any Rensselaer County employee had any direct knowledge of or connection to the medical care Burns received at RCJ. *Cf. Alvarado v. Westchester Cnty.*, 22 F. Supp. 3d 208, 218 (S.D.N.Y. 2014) (concluding that the complaint stated a *Monell* claim against the county for Correct Care's deliberate medical indifference where the county had been cited in a Department of Justice report indicating that its medical care fell below "constitutionally required standards," and one of the plaintiffs had written a letter to the county executive and jail officials complaining that Correct Care failed to utilize proper heroin detoxification systems and that inmates, including the plaintiffs, were suffering withdrawal symptoms).

The Court therefore concludes that these allegations fail to allow a plausible inference that Burns' death is "fairly traceable" to Rensselaer County's conduct in contracting with Correct Care to provide medical services at the RCJ.[11] *See Gleeson*, 2019 WL 4754326, at *16 n.24, 2019 U.S. Dist. LEXIS 170373, at *45 n.24 (rejecting the plaintiffs' municipal liability claim against the defendant county finding "the County's approval of the [medical provider's] contract is too far removed from [the plaintiff's] treatment to support the requisite causal connection"); *Sanchez*, 2018 WL 6510759, at *11, 2018 U.S. Dist. LEXIS, at *29–30 (finding complaint failed to state a *Monell* claim against the county, explaining that "while the Second Amended Complaint describes a number of incidents from other states in which Correct Care allegedly provided inadequate medical care, it does not plausibly plead that Correct Care was actually at fault in those cases" or that the county "was aware of those other incidents" but even if the county "had some knowledge of Correct Care's alleged 'troubled track record,'" there were no facts suggesting "the . . . incidents at other facilities were the result of the type of cost-cutting decisions that supposedly resulted in Sanchez's death"). Accordingly, the *Monell* claim against Rensselaer County is dismissed.

---

[11] There are two additional allegations in the TAC regarding the County's alleged liability, both of which are unavailing. Plaintiff asserts that Rensselaer County's prior employment of Correctional Medical Care, Inc., a private medical company with "a well-documented history of killing and severely injuring inmates across New York," and Dr. Fricke, who formerly was a CMC employee, should have alerted the County "of the need to ensure that the medical providers and staff they already employed . . . did not continue to engage in wanton disregard of the detainees in their jail." (Dkt. No. 115, ¶ 66). This allegation is wholly speculative and does not allow an inference of a policy of deliberate indifference to medical care with respect to Burns or any other detainee. The TAC also alleges that Plaintiff's "[c]ounsel has seen County Governments specifically request that medical staffing hours be reduced to lower contract prices," and alleges "[a]lternatively that the County of Rensselaer specifically requested that nursing and clinical staffing hours be reduced for monetary reasons." (*Id.* ¶ 62). Apart from being entirely speculative, these allegations fail to state a municipal liability claim because there is no allegation that Burns requested medical care but was not seen because medical staff was unavailable.

### B.    State Law Claims

Because the only ground on which Defendants seek dismissal of Plaintiff's state law claims is the anticipated dismissal of their federal claims, (Dkt. No. 144-3, at 25; Dkt. No. 145-3, at 31 n.2), their request that the Court decline to exercise supplemental jurisdiction over their state law claims is denied.[12]

### V.    CONCLUSION

For these reasons,

**ORDERED** that the federal claims (the First and Second Causes of Action) against Defendants Fricke, Thomas, and DeMaurio[13] are **DISMISSED without prejudice**; and it is further

**ORDERED** that Defendant Fricke's motion to dismiss (Dkt. No. 144) is **DENIED**; and it is further

**ORDERED** that the motion to dismiss (Dkt. No. 145) by Defendants Sanchez, Correct Care, and Rensselaer County is **GRANTED in part** and **DENIED in part**; and it is further

---

[12] To the extent Dr. Fricke argues that given the dismissal of the federal claims against him the supplemental state law claims against him must be dismissed as well, any such argument is without merit as the federal claims against FNP Sanchez and Correct Care remain, *see Harvey v. Farber*, No. 09-cv-152, 2011 WL 5373736, at *3, 2011 U.S. Dist. LEXIS 127711, at *8 (N.D.N.Y. Nov. 4, 2011) (explaining that "[p]ursuant to [28 U.S.C. §] 1367(c)(3), the Court may only exercise its discretion to decline to exercise supplemental jurisdiction when *all original jurisdiction claims* are dismissed as to *all of the defendants*." (emphasis added) (citing 16 Moore's Federal Practice–Civil § 106.66(1) at n. 6 (2010) (noting that "[s]ubsection (c)(3) requires that all claims over which it has original jurisdiction must have been dismissed before a district court may rely on that provision as a basis for dismissing the supplemental claims. This refers to all claims in the case, not just those claims asserted against a particular defendant. If a defendant faces only state claims, the court must exercise its supplemental jurisdiction over those claims as long as claims remain against other defendants for which original jurisdiction is present")), and the state law claims share a "common nucleus of operative fact" with the remaining federal claims. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011)

[13] Plaintiff says she is discontinuing "with prejudice, her claims against Nurse DeMaurio," (Dkt. No. 153, at 6), but Defendants reply that "Plaintiff agreed to discontinue all claims against [Nurse Thomas] without prejudice" and the deliberate indifference claim against Nurse DeMaurio without prejudice. (Dkt. No. 156, at 4 n.1). In view of this confusion, the Court has dismissed without prejudice the deliberate indifference claims against Nurse DeMaurio and Nurse Thomas and, to the extent the parties intend a different disposition of these claims, directs Plaintiff to file a notice of dismissal or stipulation of dismissal, whichever is required under Fed. R. Civ. P. 41, articulating the parties' understood disposition of the claims against Nurse Thomas and Nurse DeMaurio.

**ORDERED** that the municipal liability claim against Rensselaer County is

**DISMISSED.**

**IT IS SO ORDERED.**

Dated: March 22, 2021
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge